CHARLES A. BONNER, ESQ. SB# 85413
A. CABRAL BONNER, ESQ. SB# 247528
**LAW OFFICES OF BONNER & BONNER**
475 GATE FIVE RD, SUITE 212
SAUSALITO, CA 94965
TEL: (415) 331-3070
FAX: (415) 331-2738
cbonner799@aol.com
cabral@bonnerlaw.com

ATTORNEYS FOR PLAINTIFFS
ALMA BURRELL, VICKYE HAYTER,
MARGARET HEADD

*E-filing*

**FILED** # 5 Pd SI

SEP 1 4 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

*ADR*

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

CV11-04569 PSG

| | |
|---|---|
| **ALMA BURRELL, VICKYE HAYTER, MARGARET HEADD,**<br><br>Plaintiffs,<br><br>vs.<br><br>**COUNTY OF SANTA CLARA, DAN PEDDYCORD, RAE WEDEL, MARTY FENSTERSHEIB AND DOES 1 THROUGH 50, INCLUSIVE,**<br><br>Defendants | Case No.:<br><br>**1. RETALIATION IN VIOLATION OF TITLE VII and FEHA;**<br>**2. FAILURE TO PROTECT FROM DISCRIMINATION UNDER FEHA;**<br>**3. DISCRIMINATION-DISPARATE TREATMENT;**<br>**4. DISCRIMINATION-DISPARATE IMPACT;**<br>**5. HOSTILE WORK ENVIRONMENT;**<br>**6. NEGLIGENT HIRING, TRAINING, SUPERVISION AND RETENTION**<br>**-42 U.S.C. § 1983;**<br>**7. VIOLATION OF PUBLIC POLICY**<br>**8. VIOLATION OF 42 U.S.C. § 1983 FREE SPEECH**<br><br>**JURY TRIAL DEMANDED** |

PLAINTIFFS allege as follows:

### INTRODUCTION

1.      PLAINTIFFS ALMA BURRELL, VICKYE HAYTER, MARGARET HEADD, bring this COMPLAINT to vindicate their federal and state constitutional, statutory and common law rights.

2.    PLAINTIFFS ALMA BURRELL (hereinafter "Ms. BURRELL"), VICKYE HAYTER (hereinafter "Ms. HAYTER"), and MARGARET HEADD (hereinafter "Ms. HEADD"), (collectively referred to as Plaintiffs) allege that DEFENDANT COUNTY OF SANTA CLARA (hereinafter "COUNTY") through SANTA CLARA COUNTY PUBLIC HEALTH DEPARTMENT (hereinafter "PHD") and managing agents of DEFENDANTS retaliated against them for engaging in protected activity and speech, and treated them differently based on their gender, female, race, African American, medical disability for Ms. HEADD, and pregnancy for Ms. HAYTER.

## JURISDICTION AND VENUE

3.    Plaintiffs bring this action pursuant to the laws of the State of California, California Fair Employment and Housing Act, Title VII of the 1964 Civil Rights Act, as amended and 42 U.S.C. Section 1983. Jurisdiction is founded upon 28 U.S.C. § 1331.

4.    Venue is proper in this judicial district because Plaintiffs' injuries, damages and harm, including the violation of Plaintiffs' Civil Rights occurred in this judicial district. Further, one or more of the DEFENDANTS reside, are headquartered and conduct business in this judicial district.

5.    DEFENDANTS are subject to suit in this County and Judicial District and are public entities that regularly employ 15 or more persons.

6.    DEFENDANT COUNTY conducts business and is a government agency operating under the color of state authority in this judicial district.

## PARTIES

7.    PLAINTIFF BURRELL is a citizen of the United States of America and is a resident of San Jose, CA. At all times here in relevant, Ms. Burrell is a Health Care Program Manager II (HCPM II) in the Public Health Department, ("PHD") a division of Santa Clara County Health and Hospital System (SCVHHS).

8.    PLAINTIFF HAYTER is a citizen of the United States of America. At all times here in relevant, Ms. Hayter was a Public Health Nurse II in the Black Infant Health Program in the PHD.

9. PLAINTIFF HEADD is a citizen of the United States of America. At all times here in relevant, Ms. Headd was a Health Education Specialist (HES) at PHD.

10. COUNTY is a municipal corporation, organized under the laws of the State of California, doing business in California as a government subdivision under color of State authority and subject to the laws of this State and the United States of America

11. DEFENDANTS DAN PEDDYCORD, RAE WEDEL, MARTY FENSTERSHEIB are residents of the County of Santa Clara and are managers and/or managing agents of DEFENDANT COUNTY.

12. At all relevant times herein, PHD was operated by supervisors, managers, and/or managing agents of the COUNTY, and as such was prohibited by law from harassing and retaliating against employees on the basis of complaining about patient care or on the basis of gender, race or pregnancy.

## RESPONDEAT SUPERIOR

13. All of the described conduct, acts, and failures to act are attributed to agents and managing agents of DEFENDANT COUNTY. Said acts, conduct and failures to act were within the scope of such agency and employment. At all times relevant herein, each participant was acting within the course and scope of his or her employment and agency.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

14. Plaintiffs have exhausted their administrative remedies by filing charges of discrimination with appropriate federal and/or state agencies and by complying with the Government Code. Plaintiff Burrell filed charges of discrimination with the EEOC Claim on 10/26/2010. Plaintiff Burrell received a right to sue letter from the DFEH on 6/28/2011.

15. Plaintiff Hayter filed charges of discrimination with the EEOC Claim on 10/21/2010. Plaintiff Hayter received a right to sue letter from the DFEH on 7/14/2011.

16. Plaintiff Headd filed charges of discrimination with the EEOC Claim on May 19, 2011 and received a right-to sue letter on August 29, 2011. Plaintiff Headd received a right to sue letter from the DFEH on June 07, 2011.

## WORKERS' COMPENSATION EXCLUSIVITY DOES NOT APPLY

17. Each and every one of the wrongful, injurious, intentional, willful, discriminatory, harassing acts and failures to act by DEFENDANTS were not normal incidents of employment and were outside the scope of the employment bargain. Thus, Workers Compensation exclusive remedy set forth in California Labor Cod § 3600 et seq. will not preempt, nor bar PLAINTIFFS' right to recover for damages set forth herein.

## ALMA BURRELL'S STATEMENT OF FACTS

18. Ms. BURRELL is employed by DEFENDANT COUNTY at Santa Clara County Public Health Department as a Health Care Program Manager II (HCPM II). Ms. BURRELL began her employment as a Health Education Specialist in 1998.

19. Ms. Burrell has never received anything lower than an "outstanding" or "exceeds expectations" mark on any of her performance appraisals, nor has she ever been disciplined. Ms. Burrell, along with her staff, has received national and state commendations from agencies such as the CDC and the California Department of Public Health.

20. In 2002, all classifications of mid-level managers throughout the County's Health and Hospital System were studied, and Ms. Burrell was grandfathered into the Health Care Program Manager II position through this process. For many years, Ms. BURRELL enjoyed working as a HCPM II, and her job continues to be both rewarding and fulfilling. However, in the past few years, the discrimination and retaliation directed toward Ms. BURRELL in the work environment has mounted to an escalating, intolerable level because she has engaged in statutorily protected activity.

21. In late 2002, upon learning that she had been placed in the HCPM II position, Ms. Burrell questioned her manager at the time, Dolores Alvarado (Ms. Alvarado) about the criteria used to determine placement into one of the three positions: specifically the HCPM II and Senior Health Care Program Manager (SrHCPM) positions. Ms Alvarado stated that those selected for SrHCPM had a broader span of control and supervised more than one program. Ms. Burrell then pointed out that if this was in fact the criteria used, that a number of SrHCPMs did not meet the specified criteria while she herself did. Ms. Burrell pointed out that

1  Nhien Leong, SrHCPM of Epidemiology and Peggy Heinrich (whose code was alternately
2  staffed Nurse Manager I/SrHCPM) (both of whom are non-African American) were managing
3  one and two programs respectively; and that Nhien supervised a staff of five (5) while she
4  herself managed two programs and a staff of sixteen (16). Ms. Alvarado then stated that the
5  decisions had been made and that it was too late to make any changes. Ms. Burrell asked Ms.
6  Alvarado who made the final decisions on assigning the new classifications. Ms Alvarado
7  responded that Division Directors, such as herself and Rae Wedel (Ms. Wedel), PHD
8  Administrative Division Director (and Human Resources liaison for PHD) made the decisions.
9  Ms. Burrell then asked Ms. Alvarado for her honest opinion regarding her promotion
10 opportunities. Ms. Alvarado responded that she believed it would be a long time before Ms.
11 Burrell would actually receive a promotion, as Ms. Wedel did not feel that she (Ms. Burrell)
12 had "paid her dues long enough." She further stated that Ms. Wedel expressed to her that Ms.
13 Burrell was "moving up too fast" in the department and that it had taken her 20 years to
14 promote to her current status. Ms. Burrell then asked Ms. Alvarado if she believed Ms.
15 Wedel's feeling had anything to do with her race and if she noticed that those receiving
16 promotion seemed to be favored by Ms. Wedel. Ms. Alvarado replied that she certainly hoped
17 race was not a factor in Ms. Wedel's assessment and that being "liked" by Ms. Wedel certainly
18 seemed to be helpful for some employees who had been promoted.

19 22.    In December 2003, Ms. Burrell applied to Human Resources to "work out of class" as a
20 SrHCPM. On December 31, 2003, Ms. Burrell received an email from Human Resources
21 representative Michele Richardson that stated "Alma Burrell meets the minimum qualifications
22 for SrHCPM."

23 23.    In July 2007, Ms Burrell met with her manager, Dolores Alvarado to discuss
24 promotion to the SrHCPM position. Ms. Alvarado explained that SrHCPM positions were
25 granted based on the following criteria: 1) span of control, 2) complexity of responsibilities, 3)
26 number of staff being managed and 4) supervision of a lower level manager. When Ms. Burrell
27 asked if the expected criterion was written policy, Ms. Alvarado replied no and that this
28 criterion was developed for use solely in the PHD. At the end of the conversation, Ms

1   Alvarado agreed that Ms. Burrell met all of the criteria for the higher position; and Ms.
2   Alvarado stated she would advocate for Ms. Burrell to receive a promotion. Ms. Alvarado also
3   suggested that Ms. Burrell should advocate her case to Guadalupe Olivas, the PHD Director at
4   that time.

5   24.     In early August 2007, Ms. Burrell met with Guadalupe Olivas, PhD (Dr. Olivas), PHD
6   Director. In that meeting, Ms. Burrell shared a plan for expanding the impact of the programs
7   she managed as well as increasing her responsibilities within the PHD. Ms. Burrell further
8   showed how she met the criterion for SrHCPM even without the additional responsibilities. Dr.
9   Olivas agreed that a promotion "could" be in order, and that she would consider the matter.

10  25.     On August 15, 2007, Dr. Olivas notified Ms. Burrell by email that now was not a good
11  time to promote her because of budget shortfalls. Ms. Burrell mentioned that other (non-
12  African American) employees were being promoted at that same time despite budget shortfalls
13  and that money to cover the additional cost was available within the budgets she managed. Ms.
14  Burrell further stated that adjustment of line items would cover the additional expense. Dr.
15  Olivas stated that she would consider Ms. Burrell's case and get back to her sometime before
16  November 2007. Dr. Olivas did not contact Ms. Burrell as promised and left County
17  employment later that same year.

18  26.     In December 2007, Ms. Burrell again initiated conversation with her manager, Ms.
19  Alvarado, about the promise of consideration for promotion by Dr. Olivas. Ms. Alvarado stated
20  that Ms. Burrell's request would have to be tabled until a new or interim director was in place.
21  Ms. Alvarado also admitted that she, along with some others (all non African American), had
22  received a promotion and wage increase within the last few weeks, and that it was important
23  for Ms. Burrell to remain patient.

24  27.     In early July, 2008, Ms. Burrell initiated yet another conversation with her manager,
25  Ms. Alvarado, about promotion. Ms. Burrell expressed her observation and disappointment that
26  many others (non African American) were being promoted while she was continually given
27  empty promises. Ms. Burrell further stated that Dr. Olivas as well as Ms. Alvarado had both
28  agreed that she (Ms. Burrell) did in fact meet the criteria outlined for SrHCPM by PHD. Ms.

1  Alvarado suggested Ms. Burrell submit a Request for Reclassification and that she would give
2  it her support. When Ms. Burrell complained that the process for reclassification could take up
3  to 2 years, Ms. Alvarado offered that it was a way to start the process of promotion.

4  28.    On July 7, 2008, Ms. Burrell submitted a Request for Reclassification to Ms. Alvarado
5  for approval and forwarding to Human Resources. Ms. Alvarado completed and signed the
6  Supervisor portion of the request on July 30, 2008.

7  29.    On July 16, 2008, Ms. Burrell was notified by her manager, Ms. Alvarado, that Marty
8  Fenstersheib, MD (Dr. Fenstersheib) the interim PHD Director was reorganizing the
9  department and as a result was Ms. Burrell would assume additional responsibilities. The new
10 duties included release of a smaller program (Traffic Safety) with five (5) staff and the addition
11 a larger program (Immunization Education) that included ten (10) more staff, one of them an
12 entry level manager, and another $2 Million in budget responsibilities. The additional program
13 brought Ms. Burrell's managerial scope to twenty-two (22) staff, $3.5 million in budget
14 oversight and supervision of three health care programs. Ms. Alvarado told Ms. Burrell that the
15 additional responsibilities will "strengthen your case for Senior Health Care Program
16 Manager."

17 30.    On November 3, 2008, Christine Goodson, Human Resources, notified Ms. Burrell that
18 her request for reclassification had been denied. The written response from Human Resources
19 stated that Ms. Burrell did not qualify for the higher level position because her overall
20 responsibilities did not include overseeing major program activities, supervising lower level
21 managers and serving on the executive team of an assigned department. The response further
22 stated that duties of the SrHCPM are performed under general direction with a great deal of
23 independence of action.

24 31.    In late November 2008, Ms. Burrell met with Christine Goodson and a union
25 representative in a face-to-face meeting about the reclassification denial. Ms. Burrell asked Ms.
26 Goodson where she got her information regarding the responsibilities of SrHCPMs in PHD, as
27 she had not performed a "desk audit" (observed and/or reviewed daily activities and
28 accompanied the requester for a specified amount of time to note first hand the job

1  requirements) or interview of Ms. Burrell or any other SrHCPM in PHD, as is the normal

2  custom following a reclassification request. Ms. Burrell also stated to Ms. Goodson that it was

3  obvious she had spoken to someone in PHD Administration, as her assessment of the

4  responsibilities of some of the other SrHCPM in PHD were extremely inflated, even to the

5  point of being false. For example, Ms. Goodson claimed that the HIV/AIDS Manager appears

6  before the Board of Supervisors to give regular reports and updates and has extensive freedom

7  to make policy decisions. Ms. Burrell responded that this was completely untrue and that

8  presentations before the Board of Supervisors are only done by the Health Officer or Director

9  of Public Health, and that Middle Managers are prohibited from making policy decisions as

10 those too are the responsibility of Executive Management. Ms. Goodson denied speaking with

11 anyone in PHD Administration, and would not verify where she had received her information.

12 Ms. Goodson also declined Ms. Burrell's request for her to perform desk audits of her work

13 and the work of other SrHCPMs in PHD for comparison.

14 32.     In December 2008, Ms.  Burrell again met with her manager, Ms. Alvarado, and

15 expressed her disappointment and concern that Ms. Alvarado had not followed through with

16 her promise to support her request for reclassification. Ms. Burrell asked Ms. Alvarado if she

17 knew who in PHD Administration had spoken to Ms. Goodson. Ms. Alvarado responded that

18 she had not, but did not comment whether she knew if another executive manager had. Ms.

19 Alvarado confirmed Ms. Burrell's question as to whether reclassifications submitted by others

20 in PHD had been approved. Ms. Alvarado further confirmed that she had advocated for their

21 approval (of note is that those approved were not African American).

22 33.     Of further note is that Ms. Burrell was told by another Human Resources representative

23 who was handling another reclassification for a young African American young woman

24 (Vickye Hayter) whom Ms. Burrell supervises, that nearly one hundred percent of requests are

25 denied if PHD Administration does not provide support. Additionally, it is important to know

26 that a lot of pressure was put upon Ms. Burrell not to support Ms. Hayter's request even though

27 she was more than qualified for the reclassification. Ms. Burrell was actually told by Ms.

28 Alvarado that if she continued supporting Ms. Hayter, PHD Administration would not look

1    favorably upon her in the future. Ms. Alvarado further stated to Ms. Burrell that if Ms.
2    Hayter's claim were to proceed toward grievance or arbitration, she (Ms. Alvarado) would
3    place the blame on Ms. Burrell and stated that Ms. Burrell was at fault for mismanagement by
4    assigning Ms. Hayter duties beyond her classification. Ms. Alvarado did not respond when Ms.
5    Burrell reminded her that she (Ms. Alvarado) knew about Ms. Hayter's assigned duties, and
6    had in fact on a number of occasions asked Ms. Hayter to present to community groups on the
7    work she was doing and that she herself (Ms. Alvarado) had at those same meeting elaborated
8    on the excellent work being performed by Ms. Burrell and Ms. Hayter. After this discussion
9    Ms. Burrell lost all pretense of support for promotion from Ms. Alvarado.

10   34.    In 2009, in an act of retaliation, Ms. Alvarado removed the Maternal Child and
11   Adolescent Health Program responsibilities and staff from Ms. Burrell, which included
12   management of four (4) staff and $1 million in funding; thereby diminishing Ms. Burrell's case
13   for promotion. When Ms. Burrell asked Ms. Alvarado why this was happening, Ms. Alvarado
14   responded that she was giving the program to someone else who needed to earn their pay. Ms.
15   Alvarado further stated that Ms. Burrell had not "dropped the ball" and this was not a
16   disciplinary action.

17   35.    In February, 2010, Ms. Burrell met with her new manager, Charis Subil, and presented
18   a plan for increasing the impact of the programs she manages, which included increasing her
19   scope of work and promoting her to SrHCPM. Ms. Subil stated that she was in agreement with
20   Ms. Burrell that she was already working at a level commensurate with SrHCPM. Ms. Subil
21   assured Ms. Burrell that she would present her proposal and request to the new PHD Director,
22   Dan Peddycord. Later in the month when Ms. Burrell asked Ms. Subil about Mr. Peddycord's
23   response, Ms. Subil suggested that Ms. Burrell should meet with him one-on-one.

24   36.    In March 2010, Ms. Burrell met with Mr. Peddycord and shared her proposal for
25   growth within the programs she manages, including promotion for herself. Mr. Peddycord said
26   he liked Ms. Burrell's ideas and that she could expect his support of the programs she
27   managed. He also stated that promoting Ms. Burrell was solely up to Ms. Subil, and that he

28

1  would support Ms. Subil's decisions. He further stated that his involvement in program matters

2  tended to be on a higher level, and that he left personnel decisions up to his managers.

3  37.    On March 23, 2010, Ms. Burrell emailed Mr. Peddycord to summarize their

4  conversation, and Mr. Peddycord responded, confirming by email that he had discussed Ms.

5  Burrell's ideas with Ms. Subil, and that some opportunities were noted. Later, when Ms.

6  Burrell relayed this information to Ms. Subil, Ms. Subil responded that she had not received

7  the same response from Mr. Peddycord and that she felt she was in a precarious situation. Ms.

8  Subil further stated that she was new to the position and unsure of her span of control in these

9  matters, and that she didn't even know how she should go about promoting staff.  (An

10  important fact to note is that not long after this conversation, Ms. Subil promoted two Public

11  Health Nurse Managers to a higher classification.) Ms. Burrell suggested that all parties should

12  meet in order to be on the same page, to which Ms. Subil agreed.

13  38.    In September 2010, Ms. Burrell, Ms. Subil and Mr. Peddycord met to discuss Ms.

14  Burrell's proposal and request for promotion. At this meeting, Mr. Peddycord's demeanor was

15  180 degrees changed from the previous meetings. When Ms. Burrell asked Mr. Peddycord

16  about his comments in their previous meeting, Mr. Peddycord responded that he would not

17  promote Ms. Burrell because she did not participate in the H1N1 emergency outreach.

18  (Discussion of the H1N1 outbreak had never been mentioned in any previous conversations

19  between any of the parties.) Ms. Burrell then reminded Mr. Peddycord that she had been out on

20  medical leave during the time of the outreach; and that when she had returned she was

21  prohibited from participation in the remaining activities by Ms. Alvarado. She added that she

22  (Ms. Burrell) had actually met with him to discuss Ms. Alvarado's exclusion of her from the

23  activities when in fact, as Immunization Education Director, Ms. Burrell should have had a

24  significant role. When it became apparent that Mr. Peddycord did not have a legitimate reason

25  to deny Ms. Burrell the promotion, he stated that she did deserve an answer, but that he would

26  not be pressed to give one. Mr. Peddycord ended the conversation by promising to "keep Ms.

27  Burrell on the forefront of his mind and would get back to her in two weeks." Ms. Burrell

28

ALMA BURRELL, MARGARET HEADD, VICKYE HAYTER COMPLAINT FOR DAMAGES - 10

1 reminded Mr. Peddycord that a SrHCPM position code was available in the department, and
2 that he could easily transfer her into the position.

3 39.    In October 2010, a revised organization chart was distributed at the PHD all-managers
4 meeting. The revised chart revealed that a significant portion of the proposal Ms. Burrell had
5 submitted to Mr. Peddycord and Ms. Subil was indeed being implemented. The revised
6 organization chart revealed that Ms. Burrell would assume the responsibility of oversight and
7 management of the Adolescent Family Life Program (AFLP). Ms. Burrell was taken by
8 surprise, as she had not been notified of the impending change, and discussions about the
9 previously submitted proposal had halted. A few days later, Ms. Burrell was called into a
10 meeting with Ms. Subil, Mr. Peddycord, Ms. Wedel and Colleen Martin. Ms. Martin had
11 previous handled oversight and management of the AFLP. Ms. Wedel and Mr. Peddycord
12 explained that effective November 1, Ms. Burrell would assume the additional responsibilities
13 once held by Ms. Martin. Mr. Peddycord and Ms. Wedel stated that the AFLP was more in line
14 with the programs managed by Ms. Burrell, and that Ms. Martin was overloaded with work.
15 Ms. Martin added that AFLP required 1/3 of her time and that removing those duties would
16 allow her more time to focus on her other responsibilities. At some point, Ms. Burrell
17 mentioned privately to Mr. Peddycord that he had essentially implemented a significant portion
18 of her proposal with no compensation to her; that Ms. Martin (a younger, non African
19 American) was only managing one and a half, (1.5) staff, while she (Ms. Burrell) was
20 managing sixteen (16); that he had in-fact increased her workload by 1/3 while reducing Ms.
21 Martins by the same amount; and that she (Ms. Burrell) had learned that he had promoted Ms.
22 Martin into the vacant SrHCPM position. Ms. Burrell reminded him that Ms. Martin did not
23 meet the criterion that had been expressed to Ms. Burrell as being a requirement for promotion
24 to SrHCPM. Mr. Peddycord replied that he was relying on Ms. Martin, and that she deserved
25 the promotion.

26 40.    On October 26, 2010, Ms. Burrell filed a racial discrimination claim with the California
27 Department of Fair Employment and Housing (DFEH).

28

41.    On May 27, 2011, Ms. Burrell received a notice of case closure from DFEH. On June 28, 2011 Ms. Burrell was issued a Notice of Right to Sue by the Equal Employment Opportunity Commission.

### VICKYE HAYTER'S STATEMENT OF FACTS

42.    Ms. Hayter is employed by DEFENDANT COUNTY at the Public Health Department Santa Clara Valley Medical Center as a Public Health Nurse II. Ms. Hayter has been in this position since March 2004. She worked in other departments within SCVHHS upon her initial employment with the County in November 2001. For many years, Ms. Hayter enjoyed working as a PHN II, and her job continues to be both rewarding and fulfilling. In the past few years, Ms. Hayter has been denied promotion more than five times, while others with less education and experience have been promoted. Ms. Hayter's work is well known and has received a national award and state recognition. However, in the past few years, the hostility directed toward Ms. Hayter in the work environment has mounted to an escalating, intolerable level because she has engaged in statutory protected activity.

43.    In December 2005, Ms. Hayter applied for a re-allocation of her position from a PHN II to a PHN III and was denied on Feb. 21, 2006. The reason for the denial per Human Resources was that she did not meet the Employment Standards for the requested classification of PHN III. The screening criterion that Human Resources used was a line from the job bulletin that states, "Sufficient experience as a Public Health Nurse to enable a candidate to demonstrate possession of the qualification. Normally a candidate would acquire the qualifications for this class through at least three years of Public Health Nursing experience." Although the criteria states "normally....at least three years..." there have been non-African American public health nurses who have been promoted to public health nurse III and public health nurse lead and public health nurse manager without having worked as a public health nurse for three years.

44. Additionally, Ms. Hayter's denial letter stated, "If you pursue this reallocation request and your position is successfully reallocated to PHN III, you shall be laid off in accordance with Merit System Rule A25-103(f) which states, "Should a permanent incumbent of a position that has been reallocated upward not qualify for that new class, the employee shall be laid off."

1   After receiving the denial decision, Ms. Hayter contacted Kathy Buchanan, Human Resource

2   Analyst, about arbitrating the decision. Ms. Buchanan instead asked Ms. Hayter if she had just

3   had a baby and was she on maternity leave, and told her that, "this is probably not a good time

4   for you." When Ms. Hayter asked if there was anything else she could do about the arbitrating,

5   she flatly told her no. Although Ms. Hayter was performing the duties of the higher

6   classification and had the support of her manager, Alma Burrell, she was still denied.

7   45.     In January 2007, Ms. Hayter applied for a job classification study request for the same

8   position, PHN II to PHN III, with the support and recommendation of her manager. She

9   attended the SEIU trainings and talked to SEIU staff to ensure that she was completing all of

10  the necessary steps in the process. Ms. Hayter was denied reclassification to PHN III in April

11  2007. According to the denial letter, Ms. Hayter was performing job duties consistent with that

12  of her current position, PHN II. In fact, Ms. Hayter was performing duties that are listed in the

13  PHN III job specification. Ms. Hayter was hospitalized for preterm labor shortly after the

14  decision and was not able to appeal.

15  46.     In December 2008, Ms. Hayter again applied for reallocation of her position from PHN

16  II to PHN III and received a denial letter on April 10, 2008. Ms. Hayter was also denied the

17  right to arbitrate. She was paid seventy (70) days of working out of class as a PHN III. PHD

18  administration ordered her manager, Ms. Burrell, to remove job duties on April 9, 2008 that

19  were not listed in the PHN II or III job specification. Ms. Hayter's manager, Ms. Burrell, was

20  told to remove all of Ms. Hayter's higher level duties, but was told the next day to remove only

21  those duties listed in the denial letter (researching grants, preparing grant applications,

22  preparing contracts and preparing budgets). According to PHD Administration, all of the other

23  duties that Ms. Hayter was performing were within the scope of her current position as a PHN

24  II. However, there are several non-African American public health nurses that have been

25  promoted to PHN Lead, PHN III and PHN Manager who have fewer qualifications than Ms.

26  Hayter.

27  47.     On April 11, 2008, Ms. Hayter contacted SEIU 521 to gather more information about

28  reclassification arbitration policy and process.

48.     On April 14, 2008, Ms. Hayter contacted Human Resources about the decision and was told that she was not allowed arbitration, and that she should talk to her manager about it. Her manager stated that she strongly supported her reclassification to PHN III and that the decision is made by Public Health Administration. Ms. Burrell was told by Kathy Buchanan, Human Resources Analyst, that "it does not look good when she and PHD administration do not agree on such matters."

49.     From April 14 – May 6, 2008, a series of emails followed between Ms. Hayter, SEIU 521 (Union), PHD Administrators and Human Resources. Ms. Hayter contacted Kacy Snodgrass, contracts enforcement specialist at the Union, about filing a grievance, since she was being denied the right to arbitrate. Ms. Hayter met with Dolores Alvarado (former PHD administrator) and Rae Wedel (PHD administrator) who were represented by Labor Relations. After that meeting Ms. Alvarado ordered Ms. Burrell to have a few more meetings about Ms. Hayter's job duties. Ms. Alvarado attempted to smear Ms. Hayter's professional credibility by telling Ms. Burrell and others in the department that Ms. Hayter had been rude and unprofessional in the meeting. Ms. Alvarado had told Ms. Burrell in previous conversations that nurses make enough money and questioned why she was applying for reclassification.

50.     On May 1, 2008, Ms. Hayter emailed Kimberly Gomez at SEIU to find out if her grievance had been filed. On May 1, 2008, she met with Marty Fenstersheib, PHD interim director at the time. He acknowledged Ms. Hayter's excellent work, but maintained that the duties were that of a PHN II. Mr. Fenstersheib thwarted Ms. Hayter's efforts to do work outside of her job specification in order to get promoted. Despite the fact that Ms. Hayter's work received national and state awards and was sought out by a variety of local agencies, Ms. Hayter's work was not compensated.

51.     On May 6, 2008, Ms. Hayter's grievance was filed with SEIU 521. Ms. Hayter requested their presence at a meeting with Public Health Administration. After filing the grievance with SEIU 521, Ms. Alvarado suggested that Ms. Hayter apply for other higher level jobs that became open. However, Ms. Hayter was denied those positions as well. The PHD systematically differentiates in promoting. Most of the positions that become available are only

1  open to nurses in Regional Nursing Services. Nurses in the Black Infant Health (BIH) program
2  are excluded from applying for those positions. Additionally, BIH is not allowed promotion
3  codes in their program, even when there is money in the budget. Ms. Hayter continued with the
4  grievance process outlined by SEIU 521 and had a few other meetings, with their
5  representation. Ms. Hayter continued the discussion via meetings and email, but began to hear
6  comments from other nurses about her case.

7  52.    On May 28, 2008, the County's Labor Relations representative, Tracy Stephens,
8  presented a response to Maki Matsumura, SEIU 521 Worksite Organizer, stating that the
9  County was not timely in their response and thus paid Ms. Hayter for working out of class, and
10  thus removed higher duties, thereby denying her arbitration opportunity. Ms. Hayter continued
11  to advocate for her right to arbitrate and be promoted to the PHN III via face-to-face meetings
12  and emails with the Union who suggested that this matter should be tabled until she returned
13  from maternity leave.

14  53.    On January 5, 2010, Ms. Hayter received a letter from Adolfo Riedel, Contract
15  Enforcement Specialist with SEIU 521, stating that her grievance had been moved to the
16  second step, and he requested notification on whether to continue to arbitration. Ms. Hayter
17  informed Mr. Riedel that she would definitely like to proceed with arbitration.

18  54.    On April 29, 2010, in a meeting with Ms. Wedel and Pablo Pineda, Labor Relations
19  Representative, and Adolfo Riedel, SEIU contracts enforcement, Ms. Wedel raised her voice
20  and degraded Ms. Hayter's work level to that of clerical. Ms. Wedel also stated in that meeting
21  that the African American population in Santa Clara County was so small, only about 2.9%,
22  and could not really be considered a community, especially since Ms. Hayter was only serving
23  a percentage of them. After the meeting, Ms. Wedel made a personal statement to Ms. Burrell,
24  indicating that she was doing Ms. Hayter a favor by allowing her to have a job. Ms. Wedel
25  commented, "You see what these people do to you...."

26  55.    Ms. Hayter continued to work with SEIU 521 to further her grievance, but the process
27  has been very slow with no resolution. The County Labor Relations department has offered to
28  pay miniscule compensation for the work Ms. Hayter has performed as a PHN III, but Ms.

1 Hayter has not accepted their offer. On November 5, 2010, Mr. Pineda emailed Mr. Riedel,
2 offering $5000 to compensate Ms. Hayter. On May 18, 2011, Ms. Corine Stoll, newly assigned
3 SEIU 521 Contract Enforcement Specialist to Ms. Hayter's case, followed with the same
4 standing offer of $5000 from Labor Relations. Ms. Stoll told Ms. Hayter that if she had been
5 promoted to PHN III back when she applied, she would have been the first to be laid off during
6 budget cuts because she would have had the least amount of seniority. Ms. Hayter informed
7 Ms. Stoll that she would have benefited from several months of compensation and professional
8 advancement as a PHN III at that time. Ms. Hayter also informed Ms. Stoll that several public
9 health nurses (all of whom were non-African American), who had been demoted to their
10 previous positions, were reinstated to their promotions shortly after the budget settled.

11 56.    As of June 2011, Ms. Hayter has been awaiting a response from SEIU 521about the
12 next step in her grievance.

13 57.    On Oct. 21, 2010, Ms. Hayter filed a complaint with DFEH and received her right to
14 sue notice on July 14, 2011.

15                          **MARGARET HEADD'S STATEMENT OF FACTS**

16 58.    Ms. Headd is employed by DEFENDANT COUNTY at Santa Clara Valley Health and
17 Hospital Public Health Department as a Health Education Specialist (HES). Ms. Headd has
18 been in this position since she became a County employee in January of 2003. For many years,
19 Ms. Headd enjoyed working as an HES. However, in the past few years, the hostile and
20 adverse treatment she has experienced has mounted to an escalating and intolerable level.

21 59.    In December 9, 2008, Ms. Headd went on a medical leave to begin cancer treatments.
22 Ms. Headd remained on medical leave until October 19, 2009. During her leave, in May 2009
23 Ms. Headd received a lay-off notice, by phone, from her manager Janie Burkhart. Ms. Headd's
24 manager's notice was followed by a letter from the Santa Clara Human Resource Department.

25 60.    In May, 2009, Ms. Headd then contacted Human Resource lay-off representative Terry
26 Chavarria several times, in an attempt to find out where she would be in placed. Ms. Headd
27 was told she would be in placed in a Management Aide code. Ms. Headd questioned the

28

1   comparability of the in placement as far as her experience and salary were concerned and Ms.

2   Chavarria said, "This is where you would be in placed."

3   61.   Ms. Headd contacted CEMA Union Representative Prudence Slaathaug in May, 2009

4   about the comparability of the in placement. Ms. Slaathaug said she would look into some

5   things and get back with her. Ms. Headd has never received a call from Ms. Slaathaug, as of

6   today's date.

7   62.   In June, 2009, Ms. Headd was subsequently laid off from her full time professional

8   HES position. Ms. Headd was in placed to a pre-professional clerical Management Aide (MA)

9   position. Additionally, Ms. Headd was placed on the County HES rehire list.

10   63.   During this time, Ms. Headd was an HES with the "Traffic Safe Communities Network

11   Program (TSCN)." This program is under the umbrella of the Chronic Disease and Injury

12   Prevention Department (CDIP). Lynn Imus, an HES who was with Immunization Program

13   (IZ), under Maternal Child and Adolescent Health (MCAH), was also on medical leave, under

14   40 years of age, and a non-African American, was laid-off and in placed in an HEA position

15   with CDIP. Ms. Headd was currently working as an HES with CDIP.

16   64.   On September 30, 2009, Ms. Headd was laid-off from the CDIP MA position and in

17   placed to another MA position. This in placement was with the Women, Infants and Children's

18   Program. Ms. Headd currently works with this program.

19   65.   Raj Gill and Corrine Vera, both in HES jobs, were also laid off on September 30,2009.

20   Raj Gill was placed in a former code and Corrine Vera was in placed to an HEA; one step

21   lower than HES. Raj Gill and Corrine Vera are under 40, not on medical leave for cancer, and

22   are non- African American.

23   66.   After returning to work, from medical leave, Ms. Headd began to look on the County

24   job listings website for job openings. Ms. Headd was informed by Alma Burrell, Healthcare

25   Program Manager II, that this was the new job code being used, rather than the HES. Alma

26   Burrell and other managers were told by Delores Alvarado, Division Director of Programs to

27   use this code so that they would not have to take anyone from the HES rehire list.

28

67.     On December 26, 2009, Ms. Headd applied for a Promotional HPS position on the County website. On January 11, 2010, Human Resource Analyst Craig Bryson responded with an email, stating that Ms. Headd application was not accepted because she did not have the experience required for the position, but could submit additional information to qualify. Ms. Headd submitted the information. Craig Bryson sent an email on January 19, 2010, stating Ms. Headd had passed the application appraisal and was placed on the eligibility list.

68.     Ms. Headd interviewed in January, 2010, for the HPS position with Jim McPherson, Healthcare Program Manager II. Raj Gill, who is under 40, has not been on medical leave for cancer treatment, and is non -African-American, was hired for the position.

69.     On April 29, 2010, Ms. Headd applied for a Transfer HPS position. Ms. Headd received an email from Craig Bryson stating that Ms. Headd was not eligible to apply for this position (a position in which Ms. Headd  was on the eligibility list), because in her current job she was outside the County transfer ban per the Union Contract. This contract also states that in placement employees can transfer and can be evaluated based on their former code.

70.     On April 14, 2010, Ms. Headd called Craig Bryson and told him that she was on the eligibility list and inquired with him if Ms. Headd would be considered for an interview because of being on the eligibility list. Craig Bryson called Ms. Headd back and responded that Ms. Headd would not be considered for this position. Ms. Headd subsequently called Alma Aballe, contact person on job announcement, to inquire about the position and was also told Ms. Headd could not transfer because of the transfer ban. .

71.     On April 19, 2010, Ms. Headd sent an email to HR Representatives Dave Manson, Terry Chavarria, and Lilli Ly, inquiring about the transfer ban. Ms. Headd was told she could use her former code for transfers.

72.     On August 19, 2010, Ms. Headd received an email from Craig Bryson about a promotional position with Public Health Administration. Ms. Headd's name was being submitted because she was on the eligibility list for an HPS position. On August 23, 2010, Rae Wedel, Division Director emailed Ms. Headd, requesting additional qualifications specific to public health administration, with specific high level complex projects Ms. Headd  has

1  previously managed. Ms. Headd responded with her qualifications and was given an interview

2  for August 27, 2010. Ms. Headd interviewed, and someone who was under 40 and non-

3  African American, was hired for the position.

4  73.    On January 4, 2011, Ms. Headd submitted an application for a Promotional HPS

5  position with CDIP. Craig Bryson emailed on January 26, 2011, stating Ms. Headd was not

6  eligible for the position. Ms. Headd responded by asking how that was possible when she was

7  already on the eligibility list. Ms. Headd subsequently received an email from him, stating that

8  Ms. Headd was correct and would be placed on the eligibility list again. Ms. Headd's name

9  was submitted to CDIP for an interview.

10  74.    On February 8, 2011, as Ms. Headd was leaving the Public Health Administration

11  Office, Charis Subil asked her where she was working. Ms. Headd responded with her

12  location. Charis Subil said, "We have to do something about that".

13  75.    On February 15, 2011, Ms. Headd interviewed for the position. CDIP hired a non-

14  African American, less than 40 years old, and not employed by the County. This hiring process

15  took place during a Countywide hiring freeze.

16  76.    On April 21, 2011, Ms. Headd informed Evelyn Caceras-Chu, WIC Healthcare

17  Program Manager II that she wanted to be reinstated in her former class. Ms. Caceras-Chu

18  answered that there were no jobs available.

19  77.    On April 25, 2011, Ms. Headd met with Aimee Reedy, PHD Executive Manager to

20  discuss her desire to promote to the HPS position. Aimee Reedy said, there were no jobs

21  available, but that she was aware of jobs first and would keep her in mind. She added that she

22  had some special projects Ms. Headd could work on."

23  78.    On July 27, 2011 Ms. Headd submitted an application for a Health Planning Specialist

24  and a Health Care Program Analyst II. Ms. Headd received an email on August 2, 2011, stating

25  that her name was submitted for an interview with CDIP for this position. On August 3, 2011,

26  

27  Ms. Headd called Patricia Hart to schedule an interview. Patricia Hart stated that the interview

28  schedule had not been set and she would contact Ms. Headd when it was set. On August 4,

2011, Patricia Hart called and said the job was deleted. She stated that it might be back on the job list in October, and Ms. Headd could apply then.

## FIRST CAUSE OF ACTION
## RETALIATION UNDER FEHA
### By All Plaintiffs against DEFENDANT COUNTY

79.     Plaintiffs incorporate by reference herein the proceeding paragraphs of the complaint as though set forth here in full.

80.     California Government Code § 12940 (h) prohibits "any employer, labor organization, employment agency, or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part."

81.     Defendant COUNTY took adverse employment action against Plaintiffs in violation of California Fair Employment and Housing Act by retaliating against Plaintiffs for participating in statutorily protected activity. Plaintiffs' complaints to the Department of Fair Employment and Housing and to the Equal Employment Opportunity Commission (EEOC) were all protected activities.

82.     Defendant's adverse employment actions against Plaintiffs as herein alleged were unprivileged, unlawful, and without business purpose.

83.     As a direct and legal result of Defendants' retaliatory conduct as set forth herein, Plaintiffs have suffered and continue to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, costs of suit, embarrassment and anguish, all to their damage in an amount according to proof.

Wherefore, plaintiffs pray for judgment as more fully set forth below.

## SECOND CAUSE OF ACTION
## FAILURE TO PROTECT FROM DISCRIMINATION UNDER FEHA
### By All Plaintiffs against DEFENDANT COUNTY

84.     Plaintiffs incorporate by reference herein the proceeding paragraphs of the complaint as though set forth here in full.

85. Government Code section 12940(k) provides that it is an unlawful employment practice for "an employer, labor organization, employment agency, apprenticeship training program, or any training program leading to employment, to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring."

86. Plaintiffs were subjected to discrimination and retaliation.

87. Defendant COUNTY failed to take reasonable steps to prevent the discrimination and retaliation.

88. Defendant COUNTY's negligence in failing to protect Plaintiffs against discrimination as herein alleged was unprivileged, unlawful, and without business purpose.

89. As a direct and legal result of Defendant COUNTY's conduct as set forth herein, Plaintiffs have suffered and continue to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, loss of future earnings and benefits, costs of suit, embarrassment and anguish, all to their damage in an amount according to proof.

90. Defendant COUNTY's failure to take reasonable steps to prevent discrimination and retaliation was a substantial factor in causing plaintiffs' harm.

Wherefore, plaintiffs pray for judgment as more fully set forth below.

### THIRD CAUSE OF ACTION
### DISCRIMINATION-DISPARATE TREATMENT
### By Plaintiff BURRELL against DEFENDANT COUNTY

91. Plaintiffs incorporate by reference herein the proceeding paragraphs of the complaint as though set forth here in full.

92. As shown by the facts as alleged herein, Defendant COUNTY treated Plaintiff BURRELL disparately, differently, discriminatorily in compensation or in terms, conditions, or privileges of employment. As shown by the facts above, Plaintiff BURRELL was repeatedly passed over for promotions. Other similarly-situated employees were not passed over for promotion. Such discrimination was motivated by plaintiff's race – African-American,

1 plaintiff's gender – female, and plaintiff's age – over 40. These characteristics were
2 "motivating reasons" for DEFENDANT'S illegal and unlawful conduct because they
3 contributed to DEFENDANT'S decision to take certain adverse action, even though other
4 reasons also may have contributed to DEFENDANT'S decisions.

5 93. DEFENDANT'S actions have caused and continue to cause plaintiff substantial losses
6 in earnings, significant loss of reputation and professional injury, loss of promotional
7 opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses,
8 loss of future earnings and benefits, cost of suit, humiliation, embarrassment and anguish, all to
9 her damage in an amount according to proof.

10 Wherefore, Plaintiffs pray for judgment as more fully set forth below.

## FOURTH CAUSE OF ACTION
## DISCRIMINATION-DISPARATE TREATMENT
### By Plaintiff HAYTER against DEFENDANT COUNTY

13 94. Plaintiffs incorporate by reference herein the proceeding paragraphs of the complaint as
14 though set forth here in full.

15 95. As shown by the facts as alleged herein, Defendant COUNTY treated Plaintiff
16 HAYTER disparately, differently, discriminatorily in compensation or in terms, conditions, or
17 privileges of employment. Ms. HAYTER was repeatedly passed over for promotion, while
18 similarly-situated co-workers were granted promotions. The latest denial of promotion
19 occurred in April of 2010, where Ms. HAYTER was told that because the African-American
20 population was small in the county, it should not really be considered a community. She was
21 told that her supervisor was "doing her a favor by allowing her to have a job." Such
22 discrimination was motivated by plaintiff's race – African-American, plaintiff's gender –
23 female, and plaintiff's pregnancy. These characteristics were "motivating reasons" for
24 DEFENDANT'S illegal and unlawful conduct because they contributed to the
25 DEFENDANT'S decision to take certain adverse action, even though other reasons also may
26 have contributed to DEFENDANT'S decisions.

27 96. DEFENDANT'S actions have caused and continue to cause plaintiff substantial losses
28 in earnings, significant loss of reputation and professional injury, loss of promotional

1 opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses,
2 loss of future earnings and benefits, cost of suit, humiliation, embarrassment and anguish, all to
3 her damage in an amount according to proof.

4       Wherefore, Plaintiffs pray for judgment as more fully set forth below.

## FIFTH CAUSE OF ACTION
### DISCRIMINATION-DISPARATE TREATMENT
### By Plaintiff HEADD against DEFENDANT COUNTY

8 97.    Plaintiffs incorporate by reference herein the proceeding paragraphs of the complaint as
9 though set forth here in full.

10 98.    As shown by the facts as alleged herein, Defendant COUNTY treated Plaintiff HEADD
11 disparately, differently, discriminatorily in compensation or in terms, conditions, or privileges
12 of employment. As shown above, Plaintiff HEADD was repeatedly passed over for
13 promotions. Even though she was on a promotional list, she had to re-apply for each job and
14 was not promoted. Such discrimination was motivated by plaintiff's race – African-American,
15 plaintiff's gender – female, plaintiff's age– over 40 and Plaintiff's medical disability. These
16 characteristics were "motivating reasons" for DEFENDANT'S illegal and unlawful conduct
17 because they contributed to the DEFENDANT'S decision to take certain adverse action, even
18 though other reasons also may have contributed to DEFENDANT'S decisions.

19 99.    DEFENDANT'S actions have caused and continue to cause plaintiff substantial losses
20 in earnings, significant loss of reputation and· professional injury, loss of promotional
21 opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses,
22 loss of future earnings and benefits, cost of suit, humiliation, embarrassment and anguish, all to
23 her damage in an amount according to proof.

24       Wherefore, Plaintiffs pray for judgment as more fully set forth below.

## SIXTH CAUSE OF ACTION
### DISCRIMINATION-DISPARATE IMPACT
### By Plaintiff BURRELL against DEFENDANT COUNTY

100. Plaintiffs incorporate by reference herein the proceeding paragraphs of the complaint as though set forth here in full.

101. Defendant COUNTY had an employment practice of hiring and promotion that had a disproportionately adverse effect on African-American, women and persons over the age of 40.

102. All 3 Plaintiffs are African-American women. Ms. Headd and Ms. Burrell are both over the age of 40.

103. DEFENDANT'S actions have caused and continue to cause plaintiff substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, loss of future earnings and benefits, cost of suit, humiliation, embarrassment and anguish, all to their damage in an amount according to proof.

104. Defendant COUNTY's employment practice was a substantial factor in causing plaintiff harm.

Wherefore, plaintiffs pray for judgment as more fully set forth below.

### SEVENTH CAUSE OF ACTION
### DISCRIMINATION-DISPARATE IMPACT
### By Plaintiff HAYTER against DEFENDANT COUNTY

Plaintiffs incorporate by reference herein the proceeding paragraphs of the complaint as though set forth here in full.

105. Defendant COUNTY had an employment practice of hiring and promotion that had a disproportionate adverse effect on African-American, women and persons over the age of 40.

106. All 3 Plaintiffs are African-American women. Ms. Headd and Ms. Burrell are both over the age of 40.

107. DEFENDANT'S actions have caused and continue to cause plaintiff substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, loss of future earnings and benefits, cost of suit, humiliation, embarrassment and anguish, all to her damage in an amount according to proof.

108. Defendant COUNTY's employment practice was a substantial factor in causing plaintiff harm.

Wherefore, plaintiffs pray for judgment as more fully set forth below.

## EIGHTH CAUSE OF ACTION
### DISCRIMINATION-DISPARATE IMPACT
### By Plaintiff HEADD against DEFENDANT COUNTY

109. Plaintiffs incorporate by reference herein the proceeding paragraphs of the complaint as though set forth here in full.

110. Defendant COUNTY had an employment practice of hiring and promotion that had a disproportionate adverse effect on African-American, women and persons over the age of 40.

111. All 3 Plaintiffs are African-American women. Ms. Headd and Ms. Burrell are both over the age of 40.

112. DEFENDANT'S actions have caused and continue to cause plaintiff substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, loss of future earnings and benefits, cost of suit, humiliation, embarrassment and anguish, all to her damage in an amount according to proof.

113.   Defendant COUNTY's employment practice was a substantial factor in causing plaintiff harm.

   Wherefore, plaintiffs pray for judgment as more fully set forth below.

### NINTH CAUSE OF ACTION
### NEGLIGENT HIRING, TRAINING, SUPERVISION AND RETENTION
### -42 U.S.C. § 1983
### By All Plaintiffs against all Defendants

110.   Plaintiffs incorporate by reference herein the proceeding paragraphs of the complaint as though set forth here in full.

111.   DEFENDANT's actions and failures as alleged constitute a pattern, practice, and custom of violations of the Civil Rights Laws of the United States, 42 U.S.C § 1983. DEFENDANTS, while acting under color of state authority and law, wrongfully and intentionally discriminated and retaliated against Plaintiffs.

112.   DEFENDANTS' conduct, as set forth above, violated Plaintiffs' Fourteenth Amendment right of Due process by retaliating against them, and thereby restricting and curtailing their right to be free of unconstitutional retaliatory conduct.

113.   DEFENDANTS' actions have caused and continue to cause plaintiffs substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, loss of future earnings and benefits, cost of suit, humiliation, embarrassment and anguish, all to their damage in an amount according to proof.

114.   As to DEFENDANTS DAN PEDDYCORD, RAE WEDEL, MARTY FENSTERSHEIB only, the acts of these DEFENDANTS as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure the plaintiffs and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to Plaintiffs and with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling Plaintiff to punitive damages against these DEFENDANTS only.

   WHEREFORE, Plaintiffs request relief as hereinafter provided.

## TENTH CAUSE OF ACTION
### RETALIATION FOR EXCERCISING FREE SPEECH
### -42 U.S.C. § 1983
### By All Plaintiffs against all Defendants

115. Plaintiffs incorporate by reference herein the proceeding paragraphs of the complaint as though set forth here in full.

116. California Government Code § 12940 (h) prohibits "any employer, labor organization, employment agency, or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part."

117. Defendant COUNTY took adverse employment action against Plaintiffs in violation of California Fair Employment and Housing Act, by retaliating against Plaintiffs for participating in statutorily protected activity and speech. Plaintiffs' complaints to the Department of Fair Employment and Housing and to the Equal Employment Opportunity Commission (EEOC), were all protected activities.

118. Defendant's adverse employment action against Plaintiffs as herein alleged was unprivileged, unlawful, and without business purpose.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for judgment against Defendants and each of them as follows:

1. For general damages in an amount according to proof;

2. For special damages in an amount according to proof;

3. For prejudgment interest in an amount according to proof;

4. For reasonable attorney's fees and cost of suit therein;

5. For punitive damages against the individual defendants only;

6. For statutory penalties and any other statutory relief;

7. For such other and further relief as the court may deem proper.

8. Plaintiffs hereby demand a trial by jury.

JURY TRIAL DEMANDED

DATED: SEPTEMBER 12, 2011

LAW OFFICES OF BONNER AND BONNER

By:

CHARLES A. BONNER

ATTORNEY FOR PLAINTIFFS